Oyez, oyez, oyez. All persons have the right to own business or property in the United States Court of Appeals before the Court of Arbitration. I must draw back my sentence. The Court is now seated. representing the appellant claimants. It's a pleasure to be in this courtroom. I was born and spent the first 18 years of my life in Richmond, so I'm happy to be back in my hometown. Panel, I have three discreet arguments to make based on facts that we do not think are essentially in dispute, facts related to the claimants, facts related to the assets, and facts related to the enforcement of the forfeiture order. The claimants in this case reside in their host country. They live there. They work there. They have homes there. They have businesses there. They had no plans to come to the United States prior to their indictment, and in fact, all but three have never stepped foot on American soil. Two, the assets. All of the assets in question are located outside of the United States, either in New Zealand or in Hong Kong. And number three, the enforcement efforts to date. Following the initial registration of the seizure orders, both the New Zealand and the Hong Kong courts released millions and millions of dollars after the district court entered the order permitting forfeiture. Not only did the Hong Kong and New Zealand courts actually release millions of dollars, but the New Zealand court specifically refused to register or to have registered the district court's forfeiture order. The High Court in New Zealand stated, and this is at 2197, 2199, and 2207, the consequences of registration may well be more permanent and more serious than they were understood by Judge O'Grady. That enforcement of the forfeiture order would ride roughshod over New Zealand laws. New Zealand knows no principle of fugitive disentitlement. Such harshness has no place in New Zealand law. The two arguments that I would ask the panel to permit me to run through today addresses the in-rem jurisdiction and fugitive disentitlement. With respect to in-rem jurisdiction, we submit, because the district court did not have control over the property sought to be forfeited, that this court requires either actual or constructive possession, neither of which exists here. And as to fugitive disentitlement, which we believe the court based on essentially the fact that the claimants, most of the claimants, were opposing extradition, that finding was inappropriate because the statute requires, as I will hopefully have a chance to argue, that the court could not find on this record that the reason claimants did not enter the jurisdiction was to avoid prosecution. As it relates to in-rem, as this court well knows, this court, in a Titanic I and Titanic II cases, held that no action can lie in-rem in the absence of district court's actual or constructive possession of the defendant property. And constructive possession… But isn't that precisely why 1355 was amended? Actually, 1355, Your Honor, could not do away with in-rem jurisdiction. If you take a look at 1335… Not to do away with it, but to speak to whether the standard of actual or constructive possession is the test. I know that certain courts have referred to the amendments that 1355 is providing for that, but if the court were to take a look at various sections, 1355A, 1355B, and 1355D, nowhere is it provided for. 1355A speaks to subject matter jurisdiction, 1355B speaks to venue, and 1355D speaks to service of process. But that's precisely the point, or at least that was precisely the point that the Second Circuit made when it said it was amended to provide district courts with in-rem jurisdiction over a race located in a foreign country without any mention whatsoever of actual constructive possession. So your referral to the absence of that language simply supports or is in line with the Second Circuit's rationale. Well, Judge, actually the Second Circuit in Mesa, which is the lead case here I would submit, actually has held that 1355 did not do away with in-rem jurisdiction. If you take a look in Mesa, the Second Circuit specifically held that in addition to whatever 1355 actually provides, court has to be satisfied that there has to be actual or constructive possession. And that particular court basically imposed the obligation on the government to actually demonstrate that it was reasonably certain that the seized assets would be brought from England to the United States. And in fact, I would submit, Your Honor, that 1355 couldn't do anything else. And why not? Because in-rem jurisdiction, as the court knows, unless a court were to find that the court has actual or constructive possession of the property, it would butt up against the actual case or controversy. There would not be a case that would be, in our view, justiciable. And for the very reason courts have to have definite judgments. They can't be asking for hypothetical or speculative judgments. In a case like this, what you have, in fact, are admissions not only by the government, but statements by the district court and pronouncements by the foreign courts to the contrary. At 1982, the district court, when it entered the forfeiture order, stated that the New Zealand and Hong Kong courts, quote, may or may not choose to register and order a forfeiture issued by the court, close quote. The government, at page 20 of their brief, in a footnote 13, stated, this case clearly demonstrates that even with the valid forfeiture order, the fugitive's property may suffer no adverse effect. And then the New Zealand court, at 2199 and 2207, as I just articulated earlier to the court at the outset, refused registration. So far from there being any, being reasonably certain, anything could be said with regard to this particular case. If the district court is going to be issuing an opinion that is going to have some enforcement abroad, clearly there has to be a record which does not exist here. Well, you have, you do have the request to restrain the assets being granted subject to releases of certain funds for living and legal expenses. Clearly, yes, Your Honor, that is. That looks a little bit like it might be constructive possession, doesn't it? Well, first of all, Your Honor, I would call to the court's precedence in Titanic, which basically said that constructive possession cannot exist where property exists within the sovereign territorial limits of a foreign country. But even if you were to adopt the Mesa ruling, you would still have to make a determination that it was reasonably certain. Since you have a New Zealand court. But Mesa has subsequently, at the very least, the Second Circuit has distanced itself from Mesa. I would respectfully disagree with that, Your Honor. I think there is a decision that was issued that made no reference to it at all, and I don't know how the courts or Congress could abrogate Article III case or controversy issues. However it stacks up, we would respectfully submit, Your Honor, that in this case, you have anything other than assurance that the New Zealand and Hong Kong courts are going to somehow enforce or recognize the order of the district court. You already have the New Zealand High Court refuse to recognize the forfeiture order. It essentially said that the forfeiture order is repugnant to the public policy of the state of the country of New Zealand. And then you have millions of dollars that have been released in both the Hong Kong and New Zealand courts from and after the registration. So whatever standard the court ultimately will land on with regard to constructive jurisdiction, the record clearly is lacking here. If I may turn to the 2466, the fugitive disentitlement argument, unless the court has any further questions on that. As the court knows, under Section 2466, the district court would have had to have determined that the claimant has deliberately avoided criminal prosecution by evading the criminal court's jurisdiction. While this court, while the Fourth Circuit hasn't addressed what is required by this section, the D.C. and the Sixth Circuits have. And they have held that the plain language requires the government to show that avoiding prosecution is the reason claimants have failed to enter the United States. The desire, these courts have held, that the desire to avoid prosecution must be at least the principle, if not the sole reason, for claimants' decision to remain overseas. I would respectfully submit that there is no way, based on this record, and the government doesn't even attempt to show it, that the primary or sole reason claimants haven't come to the U.S. is to avoid prosecution. The district court disregarded or ignored the Second Circuit and D.C. Circuit decisions, instead relied on a Second Circuit case, the Colosso case, which basically spoke to any form of specific intent analyzed under the totality of the circumstances. And we would submit, if you take a look at the language, there's got to be some causal connection between the reason why someone is overseas and the decision not to enter the United States. All that exists here, if you strip out errant Twitter messages, is the opposition by various claimants to the extradition requests that have been made. But by requiring that evasion must have been in order to avoid prosecution, the principal intent to remain abroad must be there. You could have a situation where someone is sick, very sick, maybe on his or her deathbed, and they are still opposing extradition. Under the district court's ruling, you could find, well, you failed to enter the United States, you had notice of that, and potentially you could make an argument that anytime anyone opposes extradition, they have the specific intent to avoid coming to the United States to accept the invitation to be prosecuted. But that's not necessarily true, is it? The district court found that there was specific intent considering the totality of the circumstances, not standing alone. So presumably, in your hypothetical, the fact that a person was on his or her deathbed would be taken into consideration under the totality of circumstances and would militate against the finding of specific intent, wouldn't it? I agree that the court would have to look at all of the facts in the record. The problem here, Your Honor, is that, as the court well knows, this case was decided at the outset. And we have submitted, and it's reflected in our briefs, that we believe that all reasonable inferences were viewed most positively for the government. In the Colossos case that the court relied on, this was a motion that was made after discovery, after discovery had been completed, a motion for summary judgment, where there had been a full and fair record, where the claimant in that case failed to show up for depositions. Here, all of these facts occurred that were developed in the record, and it's still unrebutted that these claimants live abroad, they work abroad, they have families abroad, they have businesses abroad, they had no intentions of coming into this country. And I would say that there is no court that we've been able to find, no decision, that has held that a claimant who never previously entered the United States is a fugitive under 2466 by simply contesting extradition. And courts have stated that opposing extradition does not explain, in and of itself, why claimants have not entered the United States. Well, that's why you consider it in context. Yes, Your Honor, and what I would suggest is as follows. If you are looking at 2466 and you're trying to figure out how best to apply it to the facts, I would ask the court to consider the following. Number one, as the court knows, there's the charming Betsy canon of interpretation. Here you have claimants who are exercising their treaty-based rights, and if you are going to construe the statute in a way to derogate from their rights, the New Zealand court observed at 2199 to 2200, they observed, quote, the applicability of the fugitive disentitlement doctrine who is exercising bilateral right to defend extradition is to put that person on the horns of an unconstitutional dilemma. That's not just instructive. That's a ruling by the very court that would have to enforce the district court's ruling. The situation is even more egregious in the case of claimant Mr. Echternach, who is a citizen of Germany. He relies on the Mutual Legal Assistance Treaty, which is a treaty that was ratified by an act of Congress after 2466 was adopted. We believe that particular treaty says you cannot impose any coercion on behalf of any person who is otherwise subject to receiving any process abroad. And here, if you're going to disentitle Mr. Echternach on the basis of 2466, we would submit that that would violate the supremacy clause. Finally, with respect to due process, if I may. And that would be because the treaty was the last enactment? Correct. Okay. That's right. That's correct. Lastly, with respect to due process, while the Fugitive Disentitlement Doctrine has made its way into our jurisprudence in cases spanning some 140 years, the Supreme Court has consistently refused to expand the doctrine beyond the confines of a criminal appeal initiated by a defendant who fled the jurisdiction. And Deegan, the Supreme Court of the United States in Deegan, reaffirmed this principle. In this case, we would submit it's the same as Deegan. The only difference is now we have a statute. But in Deegan, specifically reserved the right for a constitutional challenge. And what that means, and there shouldn't be a difference, we would submit, as to whether it's a court decision or whether it is an act of Congress. We believe that there should be a hearing defended by the claimants so that there can be a full record. I would submit that the due process standard should require nothing less. I see that my time has lapsed. I have reserved a few minutes, and unless the court has any questions, I will resume after the government continues. Mr. Prabhu. Thank you, Your Honor. May it please the Court. My name is Jay Prabhu. I'm an assistant United States attorney, and I represent the plaintiff appellee of the United States of America. The case before you falls squarely into the type of case that the Supreme Court was concerned about when it decided Deegan in 1996. A claimant in a civil forfeiture action could attempt to obtain the proceeds of his crime from the safety of foreign shores. And, in fact, would use the American courts to participate. The Deegan court was uncomfortable with the situation, but wanted Congress to explicitly provide the judiciary with the authority to manage their dockets and disentitle litigants in appropriate circumstances. Prior to Deegan, courts often did that on its own inherent authority, such as as far back as Smith v. United States. And Congress responded specifically with Section 2466. The district court below here obviously took its duty to consider the factual prerequisites of Section 2466 seriously. It endured many rounds of briefings, much more than the standard case would involve, voluminous submissions by the parties, and an adversarial hearing in January of last year. After that consideration, the court found that the government had established all five requirements that Congress had dictated. Well, let me ask you this. I mean, I know what Congress is trying to do is to change the traditional paradigm on in-rim matters, but would a district court have in-rim jurisdiction over property located in a foreign jurisdiction where the foreign jurisdiction has unambiguously indicated that it will not enforce the forfeiture order? I disagree with the factual premise. A lower magistrate court has made that ruling. That is under appeal. The statute in New Zealand specifically says that a final order of forfeiture in force in a foreign country shall be registered. There's no discretion. It's mandatory. And the New Zealand government has assured us that eventually it will be registered. It's just the court of first instance. It is under appeal. But the statute is absolutely clear. There's no wiggle room for the New Zealand court. What about the, if I recall, it's been a while, that New Zealand actually turned loose some of the property that was subject to that order? That's correct, Your Honor. How can you say it's a final and conclusive order? Well, there are two issues involved there. First, both Hong Kong and New Zealand have domestic rules allowing the release of restrained funds for two purposes, for living expenses and legal fees. That does not affect their ability to provide the money eventually due to a final order of forfeiture, and that's actually the critical issue here. This appeal is the reason it's not in force. They're arguing in New Zealand it's not final because it's being appealed to the appellate court in the United States. If this court were to rule that the forfeiture order would be in place, that argument would be taken away, and it would allow us to register the restraint. And let's be clear, in Hong Kong, there's $60 million that has been restrained. There's something more in the neighborhood of $10 million in assets in New Zealand. Both governments had told us under their mutual legal assistance treaties that when there's a final, fully appealed order of forfeiture, they will provide whatever's left in those accounts to the U.S. government. So there is a case in controversy before this court. But it sounds almost chicken and egg-like that we're waiting for the higher courts in New Zealand to review the determination of the court of first instance, and they're waiting for us to consider the in-rim jurisdictional issue on appeal? Not the in-rim issue. It's purely whether the forfeiture order is fully appealed. And in the Hong Kong statute or treaty, it says it must be a fully appealed order. And so there's nothing significant about the fact that this court is considering these issues. It just has to be fully appealed before Hong Kong will act. There will be money there regardless of how many releases. There's just too much money. And that's money that belongs to the victims in this case, and that's an important fact that's often lost. When the judge made the forfeiture order, he had analyzed three years of actions by the claimants to undermine his restraints, the restraints he issued. And, in fact, under 1355, we believe that the court had the authority to issue that order because those monies are specifically contemplated as being forfeitable. And it gets a little bit back to Judge Floyd's question. Judge O'Grady held that under 1355B, it is sufficient to show that the acts giving rise to the forfeiture of these assets occurred in the district. So he actually based his in rem jurisdiction on that rather than the fact that the items had been restrained at our request, which is our position actually. So there are actually two bases we believe that would allow the court to uphold the forfeiture orders. 1355 said that as long as the acts giving rise to forfeiture occurred in the district, that clearly happened here. There were servers that were operated here, long-term business contracts, millions of dollars spent in this district. But in its memorandum opinion, the district court stated it would determine whether there were sufficient allegations to support the inference that there was a substantial connection between the assets and the alleged criminal activity. And at 2016 of the joint appendix, he analyzed those issues in great detail. He looked at each asset and compared it to the conduct, and he said there was a relationship. And so that clearly is sufficient for jurisdiction in rem. And the fact that it's located in a foreign country, there's the Meza case, and then there's all the other cases. There are four districts, including the Second Circuit, who've all said that actual or constructive possession is not required. And Meza has been, in our view, abrogated because the HSBC case, as Judge Duncan pointed out, said Section 1355 provides the district courts within rem jurisdiction over res in a foreign country. Although Meza is the earlier of the two. Correct. Presumably, in case of conflict, it would control. Well, and that's the question, Your Honor, that you have the D.C. Circuit saying that actual and constructive possession isn't required. You have the Third Circuit saying that. So we believe that Meza is the outlier. And, in fact, all those cases say Meza is an outlier. There's no actual or constructive possession required. But what happened here? Judge O'Grady issued restraining orders. They were registered in foreign countries. And there is no dispute that the material was restrained and remains restrained. There's no dispute about that. The question is how much of it is left. And there's nothing in the record that suggests that there's no money left. There is money and assets in both countries. And so there is still a case in controversy before the court. I want to go back to my hypothetical and forget about the New Zealand courts. The hypothetical was if a foreign jurisdiction has unambiguously indicated that it will not enforce a forfeiture order, where is it? That goes to the enforceability of the order. It doesn't go to the jurisdiction, which is the distinction. The question before the court I would submit is whether you have the jurisdiction. Whether eventually that order will be respected is a matter to determine down the road. We believe that it's clear in both countries they've said they will. And the fact that they had an early victory with the equivalent of a magistrate judge does not mean that it's impossible. And so we would submit that the jurisdiction is the important question before the court. So you don't think, you're not concerned about the bindingness of any order for Article III jurisdiction? We don't believe it's required. And, in fact, we believe in this case that there is no refusal yet by the government of New Zealand because their statute is quite clear. It says shall register. There's no ambiguity in it, and therefore that eventually will happen. And in Hong Kong there's definitely no concern that eventually that money will be transferred upon a fully appealed forfeiture order. This case is important because it involves the exact situation that Deegan was taking on. Claimants who've done everything possible to avoid criminal prosecution in the same district for more than three years, and yet they're asking the same court to allow them the opportunity to obtain the proceeds of their crimes from the safety of foreign shores. So what do we do about the language in D.C. Circuit opinions suggesting that the intent to avoid prosecution must be the intent? Well, Your Honor, that was a summary judgment case, and that makes it very different. In the Second Circuit, the Ninth Circuit, the Sixth Circuit, all of them have made clear in non-summary judgment cases that it doesn't have to be the reason. But think about the summary judgment phase. There can be no genuine issues of material fact at that stage. And the facts in the D.C. Circuit case are actually quite interesting. There were two warrants years apart. The defendant said that he didn't wish to re-enter the country regardless of any pending charges. But the 1998 warrant may have been non-operable, and there was no evidence he even knew of the 2005 warrant. So there were definitely issues related to whether he knew what staying away was to avoid prosecution. And what's really interesting about that case also is the district court in that case found that an application of 2466 comported with due process. And I thought I would talk about that for a few minutes. All of the Supreme Court cases raised by the claimants involve the right to be on notice and the opportunity to be heard. They've had that opportunity to hear, and they decided not to take it. They had a hearing, an adversarial hearing, as part of the 2466 process that Judge O'Grady did. And so they clearly had notice that it was possible that they could be disentitled. And so the question is, did they have the right to a hearing on the merits? And clearly under Hammond Packing and all the Supreme Court cases, they didn't. Courts can use devices like 2466 to manage their dockets. And when you have a fugitive, whether it's a traditional fugitive or someone who refuses to enter the country, as we have in this case for at least some of the claimants, it's clear that that person shouldn't be allowed to use the resources of the United States courts to do one thing while resisting its jurisdiction otherwise. Well, you've not talked about the Titanic cases. Do you believe they have any place in this case? We don't, Your Honor. Those cases are about 1333, which is about salvage and the law of fines. Those are about things that are in international waters. Very different situation. And, in fact, 1355, when it was adopted, was explicitly created to get to assets that were restrained at the request of the United States government that were located in foreign countries. There's no ambiguity about that statute. It's quite clear that this is exactly the situation that was contemplated. And the Titanic cases, they're about how can you take jurisdiction over something that's in the middle of the ocean. And in that case, they brought a vase into the court and said, this is proof that we have something out in the water. That's just a completely different situation, Your Honor. In terms of the foreign courts, I'll just reiterate that there's no dispute that the assets were seized at our request and that eventually, upon fully appealed forfeiture orders, that the government believes that it will obtain these monies. But the important element of that is these are not monies for the United States. These are actually the kinds of recoveries that victims need their government to do because it's so complicated. No private actor could do what the United States government did. It was the exact concern in the Blackmun case in the Fourth Circuit a few years ago. And that's what we're doing here. We're trying to affect the victims because, absent this proceeding, absent the 2466 finding by Judge O'Grady, the defendants would release all that money to live on as they continue to fight extradition. And it's interesting that in none of their documents and in oral argument today did they bring up the fact that in December of 2015, they were found eligible for extradition. And they've appealed that decision as well. There will be a hearing in their appellate court in August of this year. But they have been found eligible for extradition, all four of the claimants in New Zealand. And how can that not have some relevance? Well, because they are using this process to get back their proceeds and live off them and use their lawyers to fight extradition with their victims' monies. So it's a very odd situation. What about Mr. Ekternop? With respect to the treaty? Well, Your Honor, the treaty that they're talking about is about serving documents. And he was never served with any document that says that he should appear and produce any documents. It just doesn't apply. They're looking for an excuse. He was never summonsed to appear in the civil case. No request was served pursuant to the treaty. Since no summons was served, a plain reading of the treaty shows that the dismissal of his claim was not applied as a consequence of his failure to answer a summons to appear in the requesting state. The only thing that's compelling his appearance here is an arrest warrant, which is not covered by the language of the treaty. And so that's a very different situation than that. Application of fugitive disentitlement to Mr. Ekternop, in particular, is not a punishment or coercive measure. Colossos indicated that based on Hammond Packing. But the important thing is Mr. Ekternop and all the other fugitive claimants could have avoided disentitlement either by entering the United States or by convincing the district court to not exercise its discretion to disentitle them. They had that opportunity. They could present him with any facts and circumstances that might indicate that justice wasn't served by disentitlement. And the example that you discussed with Mr. Elkin about somebody being sick, that obviously would be a situation. And, in fact, the Salty case in the Sixth Circuit addresses some of that. Mr. Salty claimed that he couldn't travel to the United States as part of the facts in that case. And the district court judge refused to listen to that. That's why it was remanded. But they actually said, the Sixth Circuit said, on remand, you can still determine that the purpose of him not coming was to avoid prosecution, even though he claimed, using both affidavits and the opinion of a doctor, that he might not be able to travel. With respect to whether they're fugitives, I don't know if the court would want me to address that, but the statute is absolutely clear. It doesn't just say reenter. It says enter. That went beyond the traditional doctrine of fugitive disentitlement. And the whole question, I think I've addressed it to some degree, but just to stress it a little bit, the question of whether their intent was the reason they didn't come was to avoid prosecution. The Second Circuit is quite clear on this. The Sixth Circuit is relatively clear. The Third Circuit is clear. So the idea of using one summary judgment case just doesn't work in these circumstances. Does the court have any other further questions? Thank you, counsel. Thank you very much. Mr. Elkin. Thank you, Your Honor. There are a number of facts that counsel has attempted to articulate that don't have factual record support. Let me just say what is in the record. The claimants have not fled the United States. There has been no final order of expedition. The whole notion of what happened in the lower court is not even in the record. And most importantly, there hasn't been any conviction. So the notion that there is an issue related to victims I think is putting the cart before the horse here. The challenge that is being made here with respect to due process was explicitly provided by Deegan. And there's never been a situation, despite all of the language concerning the dangers to the integrity of the court processes, that have permitted, at least by the United States Supreme Court, fugitive disentitlement to extend beyond the confines of a criminal appeal where the defendant leaves prior to the appeal. With regard to 1355B that the government read to the court, that does not speak to personal jurisdiction. It speaks to venue. It talks about which district court could actually have jurisdiction relating to the actual facts themselves. And we're not actually disputing a venue issue here. And with respect to Mesa, in response to Judge Duncan's question, there's been no en banc review in the Second Circuit. Mesa does control. And with regard to- It hasn't been followed. But it's generally not been well regarded in other circuits, though. The other circuits that have not followed- I think you've got it wrong. Well, the other circuits that have not followed it have, number one, haven't addressed the issue of Article III and whether or not the case is justiciable, which we think is a very salient point. And secondly, those decisions refer to a statement by Senator D'Amato on the floor of Congress making a speech. If the court is interested in having legislative history, first of all, we would submit the statute is clear in its face. And it's inappropriate to rely, as the court well knows, on individual, isolated statements by congressional members. Let me ask you this. Isn't this case the reverse of usual disentitlement cases in that the claimants are not initiating these proceedings and they're not seeking the use of the U.S. courts? Where, on the other hand, the traditional case, the fugitive disentitlement, the fugitive affirmatively seeks the court's favor by appealing his conviction. That's correct, Your Honor. I think- Is that a pretty good distinction there? The Frico case in the D.C. Circuit, the Faranon case in the 11th Circuit, the poll number 3172 in the 4th Circuit, the 88,320 decision in the 6th Circuit, and the $40,877 in the 7th Circuit, those were all concerns were raised by the circuit courts in those cases. Here, this is a completely- the claimants are in a defensive posture, and those cases really counsel in favor of not finding disentitlement unless it's the claimants who are actually initiating the proceedings themselves. Counsel for the government referenced the Colosso's decision, which I mentioned at the outset. That case in the 2nd Circuit relied on Ing. Ing was specifically rejected in Deagon. It was rejected numerous instances in that particular decision. It didn't raise- didn't address any of the concerns raised in the precedents that I just articulated. And first, and most importantly, the Colosso case didn't find punishment. And that is completely contrary to the United States Supreme Court holdings in Ortega, Rodriguez, and Austin, where the courts found that fugitive disentitlement is most certainly a penalty. And there's no question that in respect of the Entrant Act, the Mutual Legal Assistance Treaty, it's not simply whether or not service of documents can occur abroad. That treaty speaks to the issue of process. And when the United States government issues an invitation for someone to appear in United States courts to answer for a criminal indictment, that most certainly, by any stretch of the imagination, would be considered to be process. Thank you very much. Thank you, counsel. I'm going to ask the clerk to adjourn the court, and we'll come down and greet counsel. Thank you, counsel.
judges: Roger L. Gregory, Allyson K. Duncan, Henry F. Floyd